1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

MARTIN GABRIEL ANDRADE,

Case No. 20-cv-1147-MMA (RBM)

12

Petitioner,

**ORDER DENYING PETITON FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

13

v.

14

RAYBON JOHNSON,

15

Respondent.

16
17

Petitioner Martin Gabriel Andrade ("Petitioner"), a state prisoner proceeding *pro*

18

*se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. No. 1.

19

Petitioner challenges his conviction from the Imperial County California Superior Court

20

in case number JCF30233 for first degree murder, which he was sentenced to fifty years

21

to life. *Id.* at 1–2.[1]

22

Petitioner presents three claims for habeas relief, alleging: (1) the trial court erred

23

in dismissing Juror Number 10 without demonstrable evidence the juror was unable to

24

perform his duties; (2) excluded enhancements were improperly included in a jury verdict

25

form in violation of Petitioner's plea agreement; and (3) the trial court erred in permitting

26
27

---

28

[1] All citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

the prosecution to introduce evidence of an unrelated knife found at Petitioner's residence. *Id.* at 6–8, 17–98. He asserts these errors violated his federal rights to a fair trial, due process, and an impartial and unanimous jury. *Id.*

Respondent filed an answer and lodged relevant portions of the state court record. Doc. Nos. 8, 17, 18. Respondent maintains habeas relief is unavailable because claims two and three allege state law violations that are not cognizable on federal habeas corpus review. Doc. No. 17 at 2. Respondent further provides that "[a]ll claims were reasonably rejected by the state court in a decision that was not contrary to, nor an unreasonable application of, United States Supreme Court precedent, or the facts presented." *Id.* While given the opportunity to do so, *see* Doc. Nos. 13, 15, Petitioner has not filed a traverse.

# I. BACKGROUND

The following facts and background are taken from the state appellate court opinion affirming Petitioner's conviction in *People v. Andrade*, D070707 (Cal. Ct. App. June 29, 2018). Doc. No. 8-3. The state court factual findings are presumptively reasonable and entitled to deference in these proceedings. *See Sumner v. Mata*, 449 U.S. 539, 545–47 (1981).

> On the night of January 5, 2013, murder victim Martin Garza, his sister Yulinda Garza,[2] and their friends Lloyd Johnson, Aaron Garcia, Joe Delgado, Juan Sanchez, and Daniel Camargo attended a birthday party on the outskirts of Brawley. Around midnight, Garza received a text message from a friend informing him of a party in a house in El Centro with an unfamiliar address. The entire Brawley group decided to drive to El Centro to attend the party. Garza, Sanchez, Johnson, and Camargo drove in Sanchez's truck, and Yulinda, Delgado, and Garcia followed them in Garcia's car.

> [2] Because Yulinda Garza shares the victim's surname, we will refer to her by her first name. For convenience, we will sometimes refer to Garza, Yulinda, Johnson, Garcia, Delgado, Sanchez, and Camargo collectively as "the Brawley group."

The Brawley group arrived at the El Centro address around 1:00 a.m. and parked the two vehicles across the street from each other near the house where the party was taking place. They all met at the corner and started to walk toward the house. Before they reached the house, a group of about six men, including Andrade, stopped and confronted them. Andrade identified his gang membership by stating, "North Side Centro." He then asked the Brawley group where they were from and inquired about their gang affiliation by asking, "What do you bang?" Andrade repeatedly asked Garza in particular what he "banged." Garza responded that they were from Brawley and did not "bang."

Yulinda became angry that Andrade was harassing Garza. She stepped in between them and said to Andrade, "Leave my brother alone. He does not bang." Andrade responded, "This is grown man's business." He then whistled and a group of about nine to 15 of his friends came from the party to join him. Andrade's group included Brandon Quevedo, who recognized Garza, Johnson, and Camargo. Quevedo told the group from the party that he knew Garza, Johnson, and Camargo and that they were "cool." He shook hands with them. Although Quevedo's greeting appeared to calm the situation, Yulinda observed that Andrade "still seemed a little bothered." She, Delgado, and Garcia felt uncomfortable and started to walk back to Garcia's car.

Before Yulinda, Delgado, and Garcia reached the car, Andrade said, "Nah, nah, nah, fuck these fools, North Side Centro." He then took a knife with a black blade out of his pocket and stabbed Garza. Immediately after Andrade attacked Garza, a fight broke out between Andrade's group and Garza and his friends, Johnson, Sanchez, and Camargo. After Andrade stabbed Garza, someone else tried to stab Johnson, but Johnson knocked his attacker to the ground. Another member of Andrade's group attacked Camargo with a knife. Camargo grabbed the knife by the blade and took it away from his attacker. He folded the knife and placed it under the rear passenger seat of Sanchez's truck.

After Johnson was free from his attacker, he went to Garza who had fallen to the ground. Johnson helped Garza stand up and tried to help him get back to Sanchez's truck, but he fell again. Garza was eventually able to get up and run back to the truck. Johnson, Camargo, and Sanchez tried to help him get into the truck, but he fell out and collapsed. He got up again and tried to run on the sidewalk, but then fell and lost consciousness. Delgado saw that Garza was bleeding heavily from a stab wound in his chest so he asked Garcia

to get a rag from his car.  Garcia gave Delgado a rag and Delgado used it to apply pressure to Garza's wound while Garcia called 911.  Police and paramedics soon arrived and Garza was taken from scene in an ambulance.

Garza died as a result of being stabbed in the chest.  An autopsy revealed three stab wounds on his body–the one on his chest, another on his left upper arm, and a third on his back.  The stab wound to Garza's chest perforated his heart and was the only fatal wound.  Five eyewitnesses identified Andrade as the person who stabbed Garza, including Johnson and Camargo.

In April 2013, Daniel Figueroa's probation officer searched Figueroa's home and found a pocket knife in Figueroa's room.  Figueroa told the officer the knife was the murder weapon in the Andrade case.  When questioned by a detective the following day, Figueroa said he saw Andrade stab Garza in the chest.  After witnessing the stabbing, Figueroa became afraid and ran to his house.  Andrade, Quevedo, and "some girls" followed Figueroa to his house, where Andrade gave Figueroa the pocket knife and told him to get rid of it.  Figueroa put the knife in a shoe box and kept the box in his room.  A cousin he shared his room with had been using the knife to cut wire.

The forensic pathologist who performed the autopsy testified that the fatal wound had the characteristics of being made by a single-edged weapon–i.e., a knife with one sharp side and one blunt side.  The margins of the wound were smooth, which "correspond(ed) to a nonserrated or smooth edged blade."  When shown the knife recovered from Figueroa's home, the pathologist testified that it was a "very likely candidate for the weapon that caused (Garza's fatal) wound(,)" but he could not say to a reasonable degree of medical certainty that it was the murder weapon.

In addition to the knife Camargo placed in Sanchez's truck and the knife recovered from Figueroa's house, police recovered three other knives: a knife from a bedroom in the house where the party the Brawley group attempted to attend occurred, a large kitchen knife that a passerby found on a newsstand rack five blocks away from the crime scene, and a folding knife from Andrade's house.

Doc. No. 8-3 at 3–6.

## II. PROCEDURAL HISTORY

On May 3, 2016, following trial, the jury found Petitioner guilty of first-degree murder in violation of California Penal Code § 187. *See* Doc. No. 18-6 ("Clerk's Tr.") at 1556, 1562. Petitioner had earlier admitted to the truth of a gang enhancement alleged pursuant to California Penal Code § 186.22(b)(1). *Id.* at 1206–08. In a bifurcated proceeding immediately following the jury verdict, the trial court found Petitioner had suffered a prior felony conviction within the meaning of California Penal Code § 667(b)–(i). *Id.* at 1557. On June 30, 2016, the trial court sentenced Petitioner to "25 years to life, doubled for the prior strike conviction pursuant to [California Penal Code §] 1170.1(c)(1), for a total sentence of 50 [years] to life with the possibility of parole." *Id.* at 1817–18.

Petitioner appealed to the California Court of Appeal, raising the same three claims presented in the present federal Petition. Doc. No. 8-1. In a reasoned decision issued on June 29, 2018, the Court of Appeal affirmed the trial court's judgment. Doc. No. 8-3. Petitioner thereafter filed a petition for review in the California Supreme Court, again raising these same three claims. Doc. No. 8-4. On October 10, 2018, the California Supreme Court denied the petition for review without a statement of reasoning or citation to authority in an order that stated in full: "The petition for review is denied. Corrigan, J., was absent and did not participate." Doc. No. 8-5.

On June 22, 2020, Petitioner filed the instant federal Petition. Doc. No. 1. On September 21, 2020, Respondent filed a motion to dismiss. *See* Doc. No. 7. After a Report and Recommendation by the assigned Magistrate Judge recommending denial, *see* Doc. No. 11, the Court adopted the Report and Recommendation and denied the motion March 26, 2021. Doc. No. 12. On July 3, 2021, Respondent filed an answer. Doc. No. 17. Petitioner has not filed a traverse.

## III. PETITIONER'S CLAIMS

Petitioner's claims include the following: (1) trial court error in dismissing Juror Number 10 without demonstrable evidence the juror was unable to perform his duties

1    violated Petitioner's federal rights to an impartial and unanimous jury, due process, and a

2    fair trial; (2) the improper inclusion of excluded enhancements on a jury verdict form

3    violated Petitioner's plea agreement and his federal rights to due process and a fair trial;

4    and (3) trial court error in permitting the prosecution to introduce evidence of an

5    unrelated knife found at Petitioner's residence violated his federal rights to a fair trial and

6    due process.  Doc. No. 1 at 6–8, 17–98.

## IV. DISCUSSION

## A.    Standard of Review

9        A state prisoner is not entitled to federal habeas relief on a claim that the state

10   court adjudicated on the merits unless the state court adjudication: "(1) resulted in a

11   decision that was contrary to, or involved an unreasonable application of, clearly

12   established Federal law, as determined by the Supreme Court of the United States," or

13   "(2) resulted in a decision that was based on an unreasonable determination of the facts in

14   light of the evidence presented in the State court proceeding."  *Harrington v. Richter*, 562

15   U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

16       A decision is "contrary to" clearly established law if "the state court arrives at a

17   conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

18   state court decides a case differently than [the Supreme] Court has on a set of materially

19   indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision

20   involves an "unreasonable application" of clearly established federal law if "the state

21   court identifies the correct governing legal principle . . . but unreasonably applies that

22   principle to the facts of the prisoner's case."  *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953

23   (9th Cir. 2004).  With respect to section 2254(d)(2), "[t]he question under AEDPA is not

24   whether a federal court believes the state court's determination was incorrect but whether

25   that determination was unreasonable–a substantially higher threshold."  *Schriro v.

26   Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  "State-court

27   factual findings, moreover, are presumed correct; the petitioner has the burden of

28   rebutting the presumption by 'clear and convincing evidence.'"  *Rice v. Collins*, 546 U.S.

333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)).  However, "[p]risoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## B.   Merits of Claims

Petitioner presented all three claims in the instant Petition to the California Supreme Court in his petition for review, which the state supreme court denied without a statement of reasoning or citation to authority.  *See* Doc. Nos. 8-4, 8-5.  Petitioner also previously presented these same three claims to the California Court of Appeal.  *See* Doc. No. 8-1.  The state appellate court denied each of Petitioner's three claims on the merits in a reasoned opinion.  *See* Doc. No. 8-3.

The Supreme Court has repeatedly stated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").  Given the lack of any argument or grounds in the record to rebut this presumption, the

Court will "look through" the California Supreme Court's silent denial to the reasoned opinion issued by the state appellate court on each of Petitioner's three claims. *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision-most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

1.   Claim One

In Claim One, Petitioner contends the trial court erred in dismissing Juror Number 10 without demonstrable evidence the juror was unable to perform his duties, in violation of Petitioner's federal constitutional right to an impartial and unanimous jury, due process, and a fair trial. Doc. No. 1 at 6, 53–77. Respondent maintains the state court rejection of this claim was reasonable under AEDPA and "[a]ny possible error was harmless." Doc. No. 17-1 at 14.

As noted above, the Court looks through the state supreme court's silent denial to the opinion issued by the state appellate court, which rejected this claim in a reasoned decision as follows:

Andrade contends the trial court violated his federal and state rights to a fair and impartial jury when it dismissed a juror without evidence that the juror was unable to perform his duty. We conclude the court properly dismissed the juror.

A. Background

On the second day of jury deliberations, the court received a jury note stating: "Juror No. 10 is taking an economics class and witness Yulinda Garza is in his class. (R)ealized 2 weeks ago. Advise(.)" The court and counsel questioned Juror No. 10 about the note outside the presence of the other jurors. Juror No. 10 explained that two weeks before during his economics class, he turned around and saw Yulinda in his class and realized who it was when he made eye contact with her. He never conversed with Yulinda; he only made eye contact with her. However, a woman he was dating showed Yulinda his picture and asked her if she knew him. Yulinda responded that she had seen Juror No. 10 in court that day wearing a plaid shirt. The court asked Juror No.

10 if being in the same class with Yulinda might affect his ability to be a fair and impartial juror. Juror No. 10 responded, "No."

The court excused Juror No. 10 from the courtroom and expressed the view that there was no need to take immediate action on the matter because Juror No. 10 and Yulinda had no interaction in their class. Defense counsel stated he "would like to sleep on it and go do research on it." The court encouraged both counsel to "sleep on it" and give the matter some consideration, and then asked the prosecutor, Marco Nunez, if he presently had any thoughts about it.

Nunez responded: "I have something extra to throw into the mix and this is kind of strange." Nunez then revealed that he used the professional networking website LinkedIn and that Juror No. 10's picture had appeared on his LinkedIn page, indicating Juror No. 10 had "looked him up." Nunez stated that "out of an abundance of caution, (he) would stipulate to having (Juror No. 10) removed because the jurors are told not to get on the internet and look up anything case related." Counsel and the court agreed to discuss the matter further the next day.

The next morning, the court asked Nunez how he came to the conclusion that Juror No. 10 had looked him up or "researched" him on LinkedIn. Nunez explained, "LinkedIn is for professionals who want to connect with other professionals, and usually in their area of expertise. (¶) And if somebody wants to connect with you on that website, they literally have to type your name in, and your name has to come up, and then, they have to go to your web page . . . ." Nunez further explained that Juror No. 10 could have found his LinkedIn page by typing his name in a search engine like Google. The information about Juror No. 10 on Nunez's LinkedIn page revealed that Juror No. 10 had looked up Nunez two weeks ago. Nunez was concerned that Juror No. 10 had been using the internet to research parties to the case in violation of the court's jury instructions. He was also concerned about Juror No. 10's waiting two weeks to disclose that he had recognized Yulinda in his economics class.

The court suggested bringing Juror No. 10 into the courtroom for questioning. Nunez suggested Juror No. 10 first be asked "a broad question . . . : Have you ever talked to anyone using the internet or social media to conduct any research or background investigation regarding any of the case facts, witnesses or parties to this case? And then see how he answers. And then the court can ask him the follow-up questions."

Defense counsel objected to "the entire procedure" and questioned why Nunez had not brought Juror No. 10's researching Nunez to the court's attention two weeks earlier when Juror No. 10 appeared on Nunez's LinkedIn page.[3]  The court had Nunez sworn as a witness and allowed defense counsel to question him.  After discussing how LinkedIn works with the court, defense counsel agreed with the court's suggestion that Juror No. 10 be brought back into the courtroom for questioning.  However, defense counsel later expressed the view that bringing in Juror No. 10 for questioning was "a fishing expedition by the prosecution, at this point, to get the juror they perceive harmful to them off the jury."  Counsel stated: "I would ask the court not to single out (Juror No. 10).  I would ask the court to follow up with all the jurors . . . and ask them the same question that's been proposed by Mr. Nunez."

> [3] Nunez explained that Juror No. 10 seemed familiar to him when he came into the courtroom for questioning and Nunez then realized that Juror No. 10 was "the one who tried to contact me on LinkedIn."

The court denied counsel's request to question all of the jurors and had Juror No. 10 brought into the courtroom for questioning.  The court asked Juror No. 10: "Following up on yesterday's session, have you talked to anyone, using the internet or social media, to conduct any kind of research or background investigation with regard to any of the facts of this case, or witnesses, or parties?"  Juror No. 10 responded, "No."  Nunez then showed Juror No. 10 his (Juror No. 10's) picture on Nunez's LinkedIn account and pointed out that "it says you found me on Home Page two weeks ago(.)"[4]  Juror No. 10 admitted that he looked for Nunez.

> [4] Nunez stated that "Home Page" is a "third-party website," indicating it was similar to a search engine like Google.

The court then asked Juror No. 10 if he had typed in Nunez's name.  Juror No. 10 replied that he typed in "Carlos Nunez," who was one of his friends, and prosecutor Marco Nunez's name "popped up on the list and I clicked on it."  The court asked him why he did that and Juror No. 10 responded, "It was . . . a familiar face and I clicked on the link(.)"  However, he said he did not recognize Nunez in the "small picture" that came up, he "just happened to click on it."  He did not do any kind of follow-up research or attempt to connect with Nunez.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The court asked Juror No. 10 if he knew who it was when he clicked on Nunez's name next to the thumbnail photograph of Nunez.  Juror 10 responded, "Not at the moment.  But you start looking through people.  See, it populates a list and you start clicking.  It happens to be that my friend's name is Carlos Nunez.  And if you are looking for their pictures or you are actually going through the links–and it just happened to be that he is also Nunez and I just went on there."  The court then asked, "But it didn't dawn on you that this was the prosecutor in this case?"  Juror No. 10 replied, "A little bit, but I just curiously clicked on it.  I shouldn't have done it."  The court then asked Juror No. 10 if before he clicked on Nunez's name, he "a little bit" thought that it was "Mr. Nunez, the prosecutor in the case(.)"  Juror No. 10 replied, "Yeah."  On questioning by defense counsel, Juror No. 10 said that once he realized it was the prosecutor, he exited the page "right away."  He did not do any research on the internet or social media.

Out of Juror No. 10's presence, Nunez stated: "He said that he found me by . . . typing in somebody else's name, Carlos Nunez.  But that's not the way it works.  You actually have to type the person's name in.  (¶) And then, he said that he saw a small picture of me that maybe looked familiar but didn't really know who it was.  That's kind of hard to believe.  We have been in this trial for months."  Defense counsel disagreed with Nunez about how LinkedIn works, stating: "Mr. Nunez is not an expert on LinkedIn.  I object to him testifying as such, as to how it works.  (¶) Mr. Nunez has himself indicated he's not very involved in social media.  He rarely uses it.  So he doesn't know how it functions.  The only information before the court is that (Juror No. 10) was looking for a friend of his named Carlos Nunez and Marco Nunez's name came up.  (¶) That's been my experience as well.  If you type in the last name of somebody, you will see everybody else with that name, in that area that you have typed in, for example, in Imperial County.  So then, the information before the court is that the juror . . . clicked on that picture, that thumbnail, as he described it, realized it was Mr. Nunez, the prosecutor, and clicked right out.  He did no additional research or information."  Defense counsel "strongly oppose(d)" excusing Juror No. 10.

The court responded to defense counsel as follows: "One thing I wanted to point out to you, which is, frankly, uppermost in my mind, is that even assuming what you say is accurate, that fails to explain why he decided to click on Mr. Nunez's name, even though he suspected that it was Mr. Nunez.  And he admitted that.  It wasn't just like he saw some person whose name came up and an image that he didn't recognize after he had clicked on the other Nunez person.  Mr. Nunez, the prosecutor here, he came up and he

purposefully clicked on Mr. Nunez, our prosecutor here, knowing or suspecting it was him. (¶) At that point, what justification does he have for pursuing that if he knows or has reason to know or suspect it is Mr. Nunez? (¶) Irrespective that this all began as an effort to contact somebody else, and even if it is accurate, like you say, that names come up, as he said, and then he starts indiscriminately clicking on other Nunezes, or other people's names who come up that he is searching for–even if some of that is all true, as I understood what he said there, my last question concerning this topic addressed if he still intentionally, purposefully clicked on Mr. Nunez, the prosecutor's name, knowing then that this was probably the prosecutor. And he had no explanation for that."

The court noted the jury was Instructed with CALCRIM No. 201 to "not use the internet, a dictionary, or other source of information or means of communication in any way in connection with this case." Defense counsel argued that Juror No. 10's conduct did not violate that instruction.

The court disagreed and stated: "(I)t seems what I have here, at least to my satisfaction, is an admission by this juror that he clicked on Mr. Nunez, the prosecutor's name, when he either realized it was him or had every reason to know that it was him. (¶) And that alone seems to me, in spite of (defense counsel's) argument to the contrary, is–in my mind, is a violation of the instructions that I have given to the jury. And it's a communication, in some way, in connection with this case. I don't know how much more general one can phrase, don't do anything by using the internet in connection with this case. And Mr. Nunez is an attorney connected to this case. (¶) And then, quite frankly, the issue involving his . . . knowing or realizing who Yulinda was is somewhat suspect. But I can understand if one thinks he is just simply exercising maybe bad judgment in not bringing it to our attention. I'm not prepared to say that he has done something knowingly untoward by not reporting as he should have, but my . . . ruling here is based on mostly what appears to be a violation of the rule involving the research in this case. And specifically under the circumstances that I have just outlined in my ruling with Mr. Nunez. (¶) So I'm going to excuse him, if that's your motion, Mr. Nunez." The court then excused Juror No. 10 on Nunez's motion and over defense counsel's objection.

B. Legal Principles Regarding Discharge of Jurors

Section 1089 provides, in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good

cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." "A trial court learning of grounds for dismissal 'has an affirmative obligation to investigate.' (Citation.) However, '(b)oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court.'" (*People v. Duff* (2014) 58 Cal.4th 527, 560 (*Duff*).)

"A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448.) The fact that a juror may be able to disregard the court's instructions without recourse "does not diminish the trial court's authority to discharge a juror who, the court learns, is unable or unwilling to follow the court's instructions." (*Id.* at p. 449.) "(A) court may exercise its discretion to remove a juror for serious and wilful misconduct . . . even if this misconduct is 'neutral' as between the parties and does not suggest bias toward either side." (*People v. Daniels* (1991) 52 Cal.3d 815, 863-864 (*Daniels*).)

"(I)n reviewing a decision to excuse a juror, we do not ask only whether substantial evidence supports the decision—i.e., whether there is evidence from which a reasonable trial court could have concluded dismissal was warranted—but further whether it appears as a 'demonstrable reality' that the trial court actually did rely on such evidence as the basis for its decision." (*Duff, supra,* 58 Cal.4th at p. 560.) "The (demonstrable reality) requirement we add to traditional substantial evidence review is that the record establish the actual basis for the trial court's decision. So long as it does, we ask only whether the evidence relied upon was sufficient to support that basis as grounds for dismissal; we do not independently reweigh the evidence or demand more compelling proof than that which could satisfy a reasonable jurist." (*Ibid.*)

## C. Analysis

We conclude the record supports the court's exercise of discretion to dismiss Juror No. 10–i.e., there was sufficient evidence for the court to reasonably find dismissal of Juror No. 10 was warranted, and the record shows a demonstrable reality that the court actually relied on that evidence as the basis for its decision to excuse Juror No. 10.

The court's preliminary instructions to the jury included the following directive: "During the trial, do not read, listen to or watch any news report or commentary about the case from any source. (¶) *Do not use the Internet . . . or other source of information . . . in any way in connection with this case* either on your own or as a group." (Italics added.)  The court also instructed the jury: "I want to emphasize that you may not use any form of research or communication, including electronic or wireless research (or) communication to research . . . regarding any subject of the trial.  If you violate this rule, you may be subject to jail time, a fine or other punishment."  The court's closing instructions included the directive to "*not use the Internet*, a dictionary, or other source of information or means of communication *in any way in connection with this case* either on your own or as a group." (Italics added.) The court later instructed: "It is very important that you *not use the Internet*, a dictionary or other source of information *in any way in connection with this case during your deliberations*." (Italics added.)

When the court brought Juror No. 10 into the courtroom for questioning during deliberations, the court asked generally whether he had used "the internet or social media, to conduct any kind of research or background investigation with regard to any of the facts of this case, or witnesses, or the parties(.)"  Juror No. 10 denied that he had done so.  However, when Nunez showed Juror No. 10 his (Juror No. 10's) picture on Nunez's LinkedIn account, establishing that Juror No. 10 had searched for and found Nunez on LinkedIn, Juror No. 10 admitted that he had searched for Nunez, but then claimed he had typed in the name of a person other than the prosecutor with the surname Nunez.  Juror No. 10 initially denied that he recognized the prosecutor when his picture came up and claimed that when he clicked on the prosecutor's name, he did not realize it was the prosecutor.  But on further questioning by the court, he admitted that he knew "a little bit" that it was the prosecutor's name he was clicking on and that he just "curiously clicked on it."  He added, "I shouldn't have done it."  Juror No. 10 then admitted that before he clicked on Nunez's name, he "a little bit" thought that it was Nunez, the prosecutor.

This exchange established that Juror No. 10 violated the court's express instruction to not use the internet to conduct any research regarding the case. Based on Juror No. 10's violation of that instruction, the court could reasonably conclude that Juror No. 10 would not follow other instructions. (See *Daniels*, *supra*, 52 Cal.3d at p. 865 ("(A) judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case

or reading newspaper accounts of the trial cannot be counted on to follow instructions in the future.").)[5]

> [5] In denying Andrade's motion for new trial, the court stated, "Now when I have a person who seems to . . . misrepresent the truth, one who purposefully seeks to undermine the integrity of the process of this court for the defendant to receive a fair and just trial as well as the People of the State of California, and then seeing . . . him acknowledging that he had done something wrong even though he had been informed not to, then this violation of the Court's instruction leaves this Court (with) a serious doubt . . . whether this person will be a fair, impartial juror, whether he will follow the instructions of the Court that the Court subsequently will give to this juror."

Although Juror No. 10 asserted that when he realized he had clicked on the prosecutor and not a different Nunez he "clicked right out" and did no additional research, the court could reasonably find that assertion was not credible in light of Juror No. 10's initial misrepresentations to the court that he had done no internet research regarding the case and was unaware that the name he clicked on was the prosecutor's name until after he clicked on it. Juror No. 10 quickly admitted these representations were false upon further questioning. Given Juror No. 10's misrepresentations, the court could reasonably find Juror No. 10 was not credible when he told the court he had done no further research on the prosecutor after clicking on his name.  In denying Andrade's motion for a new trial brought in part on the court's dismissal of Juror No. 10, the court noted Juror No. 10's initial denial that he had done any research on the internet and stated, "So right from the get-go, I've got a problem here with a person who is now seemingly misrepresenting the truth."  The court later stated, "I don't know what other research he may have done that was unknown to us."  The court's concern that Juror No. 10 had conducted additional research on the prosecutor despite asserting otherwise was reasonable. Given Juror No. 10's violation of the court's instruction to not conduct any research on the internet regarding the case and his initial misrepresentations to the court regarding his violation of the instruction, the court acted well within its discretion in dismissing Juror No. 10.

Doc. No. 8-3 at 6–17.

1     "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel

2     of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Due

3     process means a jury capable and willing to decide the case solely on the evidence before

4     it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the

5     effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217

6     (1982). Both the Supreme Court and Ninth Circuit have recognized that the seating of a

7     biased juror can implicate a defendant's right to a fair trial. *See McDonough Power*

8     *Equip. Inc. v. Greenwood*, 464 U.S. 548, 554, 556 (1984); *see also Fields v. Brown*, 503

9     F.3d 755, 766 (9th Cir. 2007) (en banc).

10          Yet, Petitioner's argument is that the trial court in his case violated his right to a

11    fair trial by erroneously dismissing a *fair and impartial* juror, not that the jury in his case

12    contained a *biased* juror. To that end, Respondent correctly observes Petitioner fails to

13    "cite to any Supreme Court case holding that dismissal of a juror during deliberations is

14    unconstitutional." Doc. No. 17-1 at 24–25 (citing *Bell v. Uribe*, 748 F.3d 857, 865 (9th

15    Cir. 2014)).

16          Here, Petitioner contends the state court decision upholding the removal of Juror

17    Number 10 violated his federal constitutional rights because the juror's internet research

18    did not warrant dismissal. In *Bell*, the Ninth Circuit addressed a similar contention, in

19    which "[t]he petitioners argue that the California Court of Appeal's decision, upholding

20    the dismissal of [a juror], was contrary to and an unreasonable application of clearly

21    established federal law because the juror's use of a dictionary did not justify the extreme

22    remedy of dismissal." *Bell*, 748 F.3d at 865. The Ninth Circuit rejected the argument

23    based on the lack of any clearly established Supreme Court authority on the matter, and

24    this Court is compelled to do the same. *See id.* at 866 ("The petitioners have failed to

25    identify any directly controlling Supreme Court precedent that contravenes the California

26    Court of Appeal's opinion that [the juror's] removal neither violated California Penal

27    Code § 1089 nor the Sixth Amendment. In the absence of established precedent, the

28    California Court of Appeal's determination that the trial court properly discharged [the

juror] for cause was neither contrary to, nor an unreasonable application of, clearly established federal law.").  Here, given the lack of any clearly established Supreme Court authority compelling habeas relief based on the allegedly improper removal of a juror, the Court is precluded from concluding the state court rejection of this claim was either contrary to or an unreasonable application of clearly established federal law.  *See Richter*, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009))).

Nor does Petitioner demonstrate the state court decision was based on an unreasonable factual determination.  Petitioner contends the dismissal of the juror lacked evidence of a "demonstrable reality that the juror was unable to perform his duty."  Doc. No. 1 at 6.  However, the record clearly contradicts this assertion.  As the state court accurately and reasonably pointed out, the record reflected Juror Number 10 had "violated the court's express instruction to not use the internet to conduct any research regarding the case" and "[b]ased on Juror No. 10's violation of that instruction, the court could reasonably conclude that Juror No. 10 would not follow other instructions."  Doc. No. 8-3 at 15.  Indeed, the trial court had repeatedly instructed the jurors not to use outside sources, specifically including the internet, in connection with Petitioner's case.  For instance, the trial court instructed the jurors with CALCRIM No. 101, entitled "Cautionary Admonitions: Jury Conduct (Before, During, or After Jury is Selected)," which included the admonitions: "Do not use the Internet, a dictionary, or other source of information or means of communication in any way in connection with this case, either on your own or as a group" and:

I want to emphasize that you may not use any form of research or communication, including electronic or wireless research or communication, to research, share, communicate, or allow someone else to communicate with you regarding any subject of the trial.  If you violate this rule, you may be subject to jail time, a fine, or other punishment.

Clerk's Tr. at 1569–70.  The trial court also gave CALCRIM No. 124, entitled "Separation Admonition," which included the following instruction:

> Remember, do not talk about the case or about any of the people or any subject involved in it with anyone, including the other jurors.  Do not do research, share information, or talk to each other or anyone else about the facts of this case or anything else connected with the trial, and do not use any form of electronic or wireless communication to do any of those things, either.

*Id.* at 1576.  The trial court also instructed the jurors with CALCRIM No. 201, entitled "Do Not Investigate," which stated in full:

> Do not use the Internet, a dictionary, or other source of information or means of communication in any way in connection with this case, either on your own or as a group.  Do not investigate the facts or the law or do any research regarding this case, either on your own, or as a group.  Do not conduct any tests or experiments, or visit the scene of any event involved in this case.  If you happen to pass by the scene, do not stop or investigate.

*Id.* at 1581.  Finally, the trial court provided the jurors with a "Pre-Deliberation Instruction" pursuant to CALCRIM No. 3550, which again included in relevant part a similar admonition, as follows: "It is very important that you not use the Internet, a dictionary, or other source of information in any way in connection with this case during your deliberations."  *Id.* at 1616.

Despite the repeated admonitions against using information such as the internet "in any way in connection" with Petitioner's case, Juror Number 10 located and clicked on the prosecutor's photo/profile on an internet site.  Moreover, when the trial court initially inquired whether Juror Number 10 had "talked to anyone, using the internet or social media, to conduct any kind of research or background investigation with regard to any of the facts of this case, or witnesses, or the parties," and added "Or attorneys, or the Judge

in any way, in any form?" Juror Number 10 replied "No" to both inquiries.  Doc. No. 18-61 ("Reporter's Tr.") at 3821.  Only after a pointed inquiry did Juror Number 10 admit to clicking on the prosecutor's name, which he stated was because he had initially searched for a friend with the same surname.  *Id.* at 3826.  Juror Number 10 also at first denied he knew it was the prosecutor's profile he had clicked on before doing so, but when asked: "But didn't it dawn on you that this was the prosecutor in the case?", Juror Number 10 conceded he knew it was the prosecutor, stating: "A little bit, but I just curiously clicked on it.  I shouldn't have done it." *Id.* at 3826.  When the trial court pressed further, Juror Number 10 again conceded he "did a little bit think" it was the prosecutor *before* clicking on the profile photo.  *Id.*  Moreover, the record reflects this issue was discovered only because the same juror had, during deliberations, belatedly alerted the trial court he was taking an economics class with a witness in the case, the victim's sister Yulinda Garza, which he had realized two weeks earlier.  When the court brought Juror Number 10 in for questioning on that unrelated matter, the prosecutor thought Juror Number 10 looked familiar and upon searching his own LinkedIn page, discovered Juror Number 10 had viewed the prosecutor's profile on that site two weeks earlier.  *See id.* at 3797–99.

Ultimately, Petitioner fails to persuasively explain how the dismissal of a juror who failed to follow the trial court's explicit and repeated instructions violates his constitutional rights.  Again, the Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722.  However, "[a] criminal defendant does not have the right to be tried by a juror who has 'explicitly indicated an inability to follow the law and instructions of the trial judge.'" *Harrison v. Arnold*, 692 Fed. App'x 442, 443 (9th Cir. 2017) (Mem.) (quoting *Lockett v. Ohio*, 438 U.S. 586, 596–97 (1978)); *see also Bell*, 748 F.3d at 865 (state court did not act unreasonably in upholding removal of juror, noting the removal was "not because she had consulted a dictionary but because she violated the trial court's explicit instructions to 'not do any independent research (which includes) . . . looking at a dictionary.'").

Nor does Petitioner demonstrate that any potential error arising from the allegedly improper dismissal of Juror Number 10 had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, 551 U.S. 112, 119 (2007) (Section 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."). Petitioner asserts the "facts strongly support the inference it was Juror Number 10 who was the holdout," noting "[p]rior to Juror Number 10's discharge, the jury had been deliberating for over one day and had multiple requests for read-back and videos," and "[b]y contrast, after Juror Number 10 was discharged and the alternate juror was substituted in, the jury deliberated for less than four hours, approximately one hour of which was spent watching appellant's taped interrogation and may have involved a lunch break, although that is not clear from the record." Doc. No. 1 at 77 (record citations omitted). Petitioner contends "a more favorable outcome-whether it be an acquittal or a mistrial-was more than an abstract possibility." *Id.* But Petitioner's contentions, which are based solely on the length of the jury's deliberations and their requests for readbacks and videos, are speculative and conclusory. Petitioner fails to show the jury that rendered the verdict in his case was comprised of anything other than fair and impartial jurors who were willing and able to follow the trial court's instructions, which Juror Number 10 had demonstrated an inability and or unwillingness to do, nor does Petitioner demonstrate a due process violation. *See Irwin*, 366 U.S. at 722 ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."); *see also Smith*, 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.")

Because Petitioner fails to demonstrate the state court decision was either contrary to or an unreasonable application of clearly established federal law or that it was based on an unreasonable factual determination, habeas relief is not warranted. *Bell*, 748 F.3d at 865–66; *Richter*, 562 U.S. at 97–98, 101. Even were Petitioner able to somehow satisfy

either part of section 2254(d), he fails to demonstrate prejudice. *Brecht*, 507 U.S. at 637. As such, Claim One does not merit habeas relief.

2.   Claim Two

In Claim Two, Petitioner contends the improper inclusion of excluded enhancements on a jury verdict form violated his plea agreement and his federal rights to due process and a fair trial. Doc. No. 1 at 7, 78–90. Respondent maintains habeas relief is not available on Claim Two because "[t]his claim fails to raise a federal question," the state court rejection of the claim involved neither an unreasonable application of federal law nor was it based on an unreasonable determination of the facts and "[i]n addition, any error was harmless." Doc. No. 17-1 at 27.

The Court again looks through the state supreme court's silent denial to the opinion issued by the state appellate court, which rejected this claim in a reasoned decision as follows:

Andrade contends his chance of receiving a fair trial was irreparably damaged when the jury was given an incorrect verdict form that called for a finding on the gang enhancement allegation in violation of his plea agreement, and a finding on the prior strike conviction allegation.

A. Background

As noted, Andrade admitted to the gang enhancement allegation under a plea agreement with the prosecution. The agreement included the parties' written stipulation to the following facts: "1. North Side Centro (NSC) is a criminal street gang in the County of Imperial. (¶) 2. Martin Gabriel Andrade is a member of the NSC criminal street gang. (¶) 3. At the time of the alleged offense in this case (1/6/13), Martin Gabriel Andrade was a member of the NSC criminal street gang. (¶) 4. Martin Gabriel Andrade's gang moniker is 'Tiny.'" This stipulation was presented to the jury.

The parties further agreed that as a result of the stipulation, neither party would introduce evidence or make reference to the following: "1) "(Andrade's) prior conviction . . . for purposes of establishing a predicate (offense) . . . under Penal Code Section 186.22(b)(1). . . . (¶) 2) Any mention of (Andrade's) tattoos or their meaning. (¶) 3) Any so-called 'gang' related writings or drawings seized from (Andrade's house . . . . (¶) 4) Any

photographs of (Andrade's) tattoos or the meaning thereof.  (¶) 5) Any photographs of (Andrade) allegedly 'throwing' or displaying gang signs. (¶) 6) Any jail records or information (Kites) which has or may have gang connotations. (¶) 7) Any 'Field Interviews' of (Andrade).  (¶) 8) The robbery/theft/assault of the 7-Eleven store which took place on or about 1/6/2013 allegedly involving (Andrade). (¶) 9) The fight which allegedly took place between (Andrade) and (another) on 1/5/2013. (¶) 10) Prior contacts between (Andrade) and law enforcement. (¶) 11) Alleged gang related photos on (Andrade's) face book page or cellphone. (¶) 12) Crimes by other members of NSC to establish the predicate element of (section) 186.22(b)(1)."

When the jury began deliberations, they were inadvertently given verdict forms that had the correct case title, but identified "Neil Evan Green" as the defendant.  On the forms to be used for a verdict of guilty of first or second degree murder, the first paragraph called for a finding that *Neil Evan Green* was guilty of murder, and the second paragraph asked the jury to make a finding of "true" or "not true" as to whether "the defendant, *Martin Gabriel Andrade*, committed the above-entitled offense for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members." (Italics added.)  The third paragraph asked the jury to make a "true" or "not true" finding as to whether *Andrade* suffered a "prior conviction of a serious or violent felony: . . . Penal Code section 245(a)(1); Conviction Date 9/21/12. . . (.)"[6]  The forms to be used for a not guilty verdict also identified the defendant as "Neil Evan Green."

> [6] As noted, the court found Andrade had a prior strike conviction in a bifurcated proceeding after Andrade waived his right to have the jury decide that issue.  During discussion of the erroneous verdict forms, defense counsel pointed out that the court had granted his motion in limine to exclude the facts of Andrade's prior conviction.  The reporter's transcript of the parties' in limine motions indicates that after lengthy argument regarding Andrade's motion to exclude his prior conviction, the court ruled the conviction would be admissible for impeachment purposes if Andrade testified, but the specific date of the conviction would be excluded.

During the jury's deliberations, its foreperson sent a note to the court stating, "We were given verdict forms for Neil Evan Green?"  The court and counsel discussed the matter out of the presence of the jury.  Defense counsel

moved for a mistrial, arguing that because the incorrect verdict forms referenced Andrade's prior conviction, Andrade was denied his right of confrontation with respect to the prior conviction, and that his right to due process and right to counsel were violated because counsel was not able to litigate the issue of the prior conviction. The prosecutor argued there was no prejudice because the jury's note showed they realized they were given the wrong verdict forms.

The court denied Andrade's motion for a mistrial. The court concluded the jury would easily be able to follow an instruction to disregard the incorrect verdict forms because the forms contained the wrong information and belonged to another case. The jury returned to the courtroom and the court instructed them regarding the incorrect verdict forms as follows: "Ladies and gentlemen, the aforementioned verdict forms for Neil Evan Green are jury forms for the wrong case. And they were erroneously given to you. They contain the wrong information. We will be giving you new verdict forms, as soon as we can, sometime this afternoon. Probably sooner, rather than later. (¶)  Please do not consider the initial verdict forms for any reason. Do not discuss them, nor allow them to enter into your deliberations in any way."

### B. Applicable Legal Principles

A motion for mistrial "should only be granted when a defendant's 'chances of receiving a fair trial have been irreparably damaged.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 128.) In other words, "'"(a) mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. (Citation.) Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'"' (Citation.) Accordingly, '(w)e review a trial court's denial of a motion for mistrial for abuse of discretion.'" (*People v. Lightsey* (2012) 54 Cal.4th 668, 718 (*Lightsey*).)

Similarly, "'"(w)e review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." (Citations.) '"A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."'" (*Lightsey*, *supra*, 54 Cal.4th at p. 729; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.) ("'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an

arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"").)

The denial of a motion for mistrial or new trial is not prejudicial and, therefore, not an abuse of discretion if it is not reasonably probable that a result more favorable to defendant would have resulted if the claimed error forming the basis of the motion had not occurred. (*People v. Welch* (1999) 20 Cal.4th 701, 749–750, citing *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Haldeen* (1968) 267 Cal.App.2d 478, 482 (trial court in the exercise of its broad discretion in ruling on a motion for new trial determines whether error is prejudicial).)

## C. Analysis

The trial court did not abuse its discretion in concluding that the incorrect verdict forms initially given to the jury did not irreparably damage Andrade's chance of receiving a fair trial.  The court reasonably concluded that any potential prejudice to Andrade resulting from the incorrect forms was curable by the court's instruction that the jury had received forms for the wrong case, the forms contained wrong information, and the jury was not to consider them for any reason or discuss them in their deliberations.  The jury is presumed to follow the court's instructions (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73), including curative instructions (*People v. Osband* (1996) 13 Cal.4th 622, 717; *People v. Yeoman* (2003) 31 Cal.4th 93, 139 ("(T)he presumption that jurors understand and follow instructions (is) '(t)he crucial assumption underlying our constitutional system of trial by jury.'")).

Accordingly, the court could reasonably assume the jury readily followed its instruction to disregard the incorrect verdict forms.  Because the jury recognized it was given incorrect forms and the court instructed them that the forms were "for the wrong case," contained wrong information, and were not to be considered for any purpose, it is highly unlikely the jury considered the gang enhancement and prior conviction references on the forms in any way that was prejudicial to Andrade.  The jury was given no instructions regarding gang enhancement findings or prior conviction findings, and the court could reasonably assume the jury would disregard the gang enhancement and prior conviction references on the incorrect verdict forms after the court instructed them that the forms were for another case.

Moreover, the jury was instructed with CALCRIM No. 104 that it was required to decide the facts in the case using only the evidence presented in the courtroom, "evidence" being limited to trial testimony, exhibits admitted

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

into evidence, and anything else the court told them to consider as evidence. Given that instruction, the jury would not have considered any information on the incorrect verdict forms as evidence in the case.  In any event, we conclude the court's error in presenting the incorrect verdict forms to the jury was harmless in light of the overwhelming evidence that Andrade was guilty of first degree murder.  Given the evidence that five eye witnesses identified Andrade as the person who fatally stabbed Garza, it is not reasonably probable that the jury would have returned a verdict more favorable to Andrade if it had not been given the incorrect verdict forms.

The jury's receipt of the incorrect verdict forms did not violate the parties' plea agreement because the gang enhancement references on the incorrect forms did not provide any of the gang-related information or other specific information that the parties agreed would not be introduced or referenced at trial as part of the agreement.  The prior conviction reference was simply a reference to a "serious or violent felony" followed by a case number and "Penal Code Section 245(a)(1)," which likely did not apprise the jury of the nature of the prior conviction. The prior conviction reference did not disclose "(t)he robbery/theft/assault of the 7-Eleven store which took place on or about 1/6/2013 allegedly involving (Andrade)," "(t)he fight which allegedly took place between (Andrade) and (another) on 1/5/2013(,)" or any "(p)rior contacts between (Andrade) and law enforcement."

The court did not abuse its discretion in denying Andrade's motions for mistrial and new trial based on the incorrect verdict forms.

Doc. No. 8-3 at 17–23.

Respondent first asserts this claim "fails to raise a federal question" as "a petitioner may not challenge an evidentiary ruling on the ground that it violated the state's evidence code," and additionally, "[t]o the extent Andrade is alleging a violation of state law in the failure of the trial court to grant a mistrial motion, his claim is not cognizable on federal habeas review."  Doc. No. 17-1 at 32–33 (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991)).  Respondent is correct that claims of error in the application of state law are generally not cognizable on federal habeas review.  The Court agrees that to the extent Petitioner claims error under state law arising from the trial court's denials of the defense motions for mistrial and a

new trial, *see, e.g.*, Doc. No. 1 at 7, 79, 84, such contentions appear to be issues that are not cognizable on federal habeas review. *See McGuire*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Rhoades*, 611 F.3d at 1142 ("[V]iolations of state law are not cognizable on federal habeas review.").

That said, Petitioner is not solely raising a claim of state law error arising from the denial of those motions. Instead, Petitioner also clearly asserts the error in his case in providing the jury with incorrect verdict forms, as well as later denying the motions for mistrial and a new trial premised on that error, was tantamount to the erroneous admission of evidence which violated his federal constitutional rights to due process, a fair trial and to present a complete defense. *See* Doc. No. 1 at 84 ("The submission of improper verdict forms to the jury was erroneous in two ways: first, it constituted a breach of appellant's plea agreement regarding the gang enhancement, and second, it resulted in the inappropriate exposure of the jury to irrelevant and prejudicial information regarding appellant's prior conviction."); *see also id.* at 88 ("The presence of the prior conviction on the verdict forms amounted to information not in evidence at the trial. When a jury is inadvertently exposed to matters not in evidence, it is similar to evidence that had been proffered at trial and to which a valid objection has been erroneously overruled.").

This states a federal claim, as Petitioner clearly contends the inclusion of the prior conviction and gang enhancements on the verdict form amounted to the improper admission of evidence which violated his federal constitutional rights, *see id.* at 7, 70–83, and the erroneous admission of evidence may state a federal claim if the admission of such evidence rendered Petitioner's trial fundamentally unfair. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the

evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'" (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986))); *see also Jammal*, 926 F.2d at 919–20 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process."). Because this aspect of claim two implicates federal constitutional guarantees, it is federally cognizable.

However, upon review, the state court's rejection of this claim was neither incorrect nor unreasonable. The state court concluded: "Because the jury recognized it was given incorrect forms and the court instructed them that the forms were 'for the wrong case,' contained wrong information, and were not to be considered for any purpose, it is highly unlikely the jury considered the gang enhancement and prior conviction references on the forms in any way that was prejudicial to Andrade." Doc. No. 8-3 at 21–22. The jurors clearly recognized they had received the wrong forms, as juror note number 2 asked: "We were given verdict forms for Neil Evan Green?" Clerk's Tr. at 1547. The trial court did not simply provide a written response but instead wrote the jurors and indicated the response would be: "Oral response in open court." *Id.*

The trial court then brought the jurors in and instructed:

> I wanted to address the issue of the verdict forms that were initially given to the jury. And we have a note here, note number two from the jury, that states, "We were given verdict forms for Neil Evan Green?" So I want to respond orally in court about that. [¶] Ladies and Gentlemen, the aforementioned verdict forms for Neil Evan Green are jury forms for the wrong case. And they were erroneously given to you. They contain the wrong information. We will be giving you new verdict forms, as soon as we can, sometime this afternoon. Probably sooner, rather than later. [¶] Please do not consider the initial verdict forms for any reason. Do not discuss them, nor allow them to enter into your deliberations in any way.

Reporter's Tr. at 3780–81.

1    As state court also noted, *see* Doc. No. 8-3 at 22, the jurors were specifically

2 instructed they were to decide the case based only on the evidence "presented in the

3 courtroom," and were further directed: "'Evidence' is the sworn testimony of witnesses,

4 the exhibits admitted into evidence, and anything else [the court] tell[s] you to consider

5 as evidence."  Clerk's Tr. at 1573 (CALCRIM No. 104); *see also id.* at 1584 (CALCRIM

6 No. 222) ("'Evidence' is the sworn testimony of witnesses, the exhibits admitted into

7 evidence, and anything else [the court] told you to consider as evidence.").  A jury is

8 presumed to understand and follow the trial court's instructions.  *Weeks v. Angelone*, 528

9 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1989); *see also Greer v.*

10 *Miller*, 483 U.S. 756, 766 n.8 (1987) ("We normally presume a jury will follow an

11 instruction to disregard inadmissible evidence inadvertently presented to it, . . . .").  In

12 addition to Petitioner's failure to cite to anything in the record to rebut the presumption

13 the jurors understood and followed the trial court's instructions to disregard the incorrect

14 verdict forms, a later juror note, number 6, further confirmed the jurors understood the

15 prior verdict forms were incorrect and were not for use on Petitioner's case, given the

16 jurors requested: "We need the *correct* verdict forms please," to which the trial court

17 replied: "They are on their way."  Clerk's Tr. at 1551 (emphasis added).

18    Even in the event Petitioner were able to demonstrate the alleged error in this

19 instance amounted to error of a federal constitutional dimension, the Court finds no

20 possibility of prejudice.  As the state court reasonably observed, "the gang enhancement

21 references on the incorrect forms did not provide any of the gang-related information or

22 other specific information that the parties agreed would not be introduced or referenced at

23 trial as part of the agreement" and "[t]he prior conviction reference was simply a

24 reference to a 'serious or violent felony' followed by a case number and 'Penal Code

25 Section 245(a)(1),'" without any accompanying details specific to Petitioner's prior

26 conviction or gang related activities.  Doc. No. 8-3 at 22–23.

27    The parties' stipulation excluded Petitioner's "prior conviction in JCF 28949 for

28 purposes of establishing a predicate under Penal Code section 186.22(b)(1)" while noting

the conviction could still be introduced as sanitized in the event Petitioner testified. Clerk's Tr. at 1203.  Also excluded were mentions or photos of Petitioner's "tattoos or their meaning;" any "'gang' related writings or drawings" seized from Petitioner's home per a search executed by warrant; photos of Petitioner "'throwing' or displaying gang signs;" any jail records or jail communications with gang connotations; "field interviews" of Petitioner; prior contacts between Petitioner and law enforcement; gang related photos on Petitioner's cell or Facebook page; and information about a fight on January 5, 2013, a January 6, 2013 robbery/theft/assault at a 7-Eleven, and crimes by other members of Petitioner's gang to establish the gang allegations under section 186.22(b)(1).  *Id.* at 1203–04.

The contested erroneous verdict forms asked for findings of "True" or "Not True" as to whether Petitioner had "committed the above-entitled offense for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members."  *Id.* at 1538, 1540, 1542, 1545.  Upon review, the verdict forms did not include the excluded information as to Petitioner's gang enhancement, as they were bereft of any of the excluded gang activity or evidence of gang involvement by Petitioner articulated in the stipulation.

The verdict forms also asked for similar "True" or "Not True" findings as to whether Petitioner had "suffered the following prior conviction of a serious or violent felony: Case JCF28949, Penal Code Section 245(a)(l); Conviction Date 9/21/12; County of Imperial, State of California, Superior Court."  *Id.*  While this latter reference cites the actual case number of Petitioner's prior conviction which was also excluded, *see* Clerk's Tr. at 1203, that case number was never provided to the jury during the presentation of evidence, nor were the jurors provided with any details concerning that conviction. Again, the trial court specifically instructed the jurors, "'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the court] tell[s] you to consider as evidence."  Clerk's Tr. at 1573 (CALCRIM No. 104); *see also id.* at 1584 (CALCRIM No. 222).  Thus, the only information provided to the jurors

concerning the contents of the contested verdict forms was an instruction to disregard those very contents.

As the state court accurately noted, not only was the jury instructed the verdict forms were not for Petitioner's case, were not correct, and were not to be considered, the jurors were also not given any instructions concerning either gang enhancement findings or prior conviction findings. *See* Doc. No. 8-3 at 22. As such, it is therefore reasonable to conclude, particularly in view of the presumption the jurors understood and followed their instructions, *see, e.g.*, *Weeks*, 528 U.S. at 234, and the fact the jurors were not provided any details as to Petitioner's gang related activity or a prior conviction, the jurors disregarded the contents of the erroneous verdict forms.

Thus, the Court remains unpersuaded the jury's brief exposure to erroneous verdict forms resulted in prejudice to Petitioner. As such, Petitioner fails to show any potential error arising from the purported admission of evidence from the incorrect verdict forms had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Fry*, 551 U.S. at 119 (Section 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it.").

Because Petitioner fails to demonstrate the state court decision was either contrary to or an unreasonable application of clearly established federal law or that it was based on an unreasonable factual determination, habeas relief is not warranted. Even were Petitioner able to satisfy either prong of section 2254(d), he fails to demonstrate prejudice. *Brecht*, 507 U.S. at 637. Accordingly, Claim Two does not merit habeas relief.

### 3.   Claim Three

In Claim Three, Petitioner contends the trial court's error in permitting the prosecution to introduce evidence of an unrelated knife found at Petitioner's residence violated his federal constitutional rights to a fair trial and due process. Doc. No. 1 at 8, 91–98. Respondent maintains habeas relief is not available on Claim Three because "this

claim fails to state a federal claim, fails on its merits under the AEDPA, and any possible error was harmless." Doc. No. 17-1 at 34.

The Court again looks through the state supreme court's silent denial to the opinion issued by the state appellate court, which rejected this claim in a reasoned decision as follows:

Andrade contends the court committed prejudicial error by allowing the prosecution to introduce evidence of "knives recovered from (his) residence (that) had no relevance to the charged offenses."

A. Background

As we noted in our statement of facts, only one of the five knives of which evidence was introduced at trial was recovered from Andrade's residence; the other four were recovered, respectively, from Figueroa's house, a bedroom in the house where the party the Brawley group attempted to attend occurred, a newsstand rack five blocks away from the crime scene, and under the rear passenger seat of Sanchez's truck. Andrade's objection at trial that he notes in his opening brief was to the evidence of the single knife recovered from his residence. Accordingly, we assume that Andrade's objection on appeal is to the court's admission of evidence of that knife, and that his plural reference to "knives recovered from his residence" is inadvertent.

When the prosecution introduced the knife recovered from Andrade's residence, Andrade's counsel objected on the grounds that the knife had "nothing to do with this case whatsoever" and therefore was irrelevant and inadmissible under Evidence Code section 352,[7] and that its admission violated Andrade's due process rights. The court overruled the objection, finding the knife was "probative" because it was "consistent with the characteristics of the knife that may have been used in the alleged murder(,)" and its admission would not be unduly prejudicial.

[7] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

B. Applicable Legal Principles

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (Citation.) Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; italics omitted.)

Even if the trial court errs in admitting or excluding evidence, the error does not require reversal unless it "caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) '(A) "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

"When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. (Citations.) When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577.)

C. Analysis

We conclude the court did not abuse its discretion in allowing the prosecution to introduce evidence of the knife recovered from Andrade's residence. Although the forensic pathologist who performed the autopsy testified that Garza's fatal stab wound had smooth margins and corresponded to a nonserrated or smooth edged blade, and that the knife recovered from Figueroa's home was a "very likely candidate" for the murder weapon, he could not say to a reasonable degree of medical certainty that the knife recovered from Figueroa's home was the murder weapon. On cross-

examination he admitted that a serrated knife will not always leave a scalloped wound, and he was reminded that he told a detective that the knife recovered from the newsstand could have caused Garza's stab wounds. The forensic pathologist who testified for the defense testified that he could not determine whether Garza's fatal stab wound was made by a straight edge blade or a serrated blade. He opined that the knife recovered from Figueroa's home did not inflict Garza's fatal wound because the wound was too deep for the length of the blade of that knife.

Thus, the specific weapon that inflicted Garza's fatal wound was not conclusively determined and the prosecution did not rely exclusively on the knife recovered from Figueroa's house as being the murder weapon. There was no evidence that conclusively eliminated the knife recovered from Andrade's house as the murder weapon. Because the knife found in Andrade's residence could have been the murder weapon, the court did not abuse its discretion in allowing the prosecution to introduce evidence of that knife. (*People v. Riser*, *supra*, 47 Cal.2d at p. 577.)

To the extent the court erred in admitting evidence of the knife recovered from Andrade's residence, the error was harmless in light of the overwhelming evidence supporting Andrade's conviction. As we noted above, five eye witnesses identified Andrade as the person who fatally stabbed Garza, including Figueroa, who told a detective that shortly after the murder, Andrade gave Figueroa the pocket knife that Figueroa's probation officer recovered from Figueroa's house and told him to get rid of it. In light of the overwhelming evidence that Andrade fatally stabbed Garza, and the evidence that he attempted to conceal the murder weapon, it is not reasonably probable that the jury would have returned a verdict more favorable to Andrade if the court had excluded evidence of the knife found at his residence.

Doc. No. 8-3 at 23–27.

Respondent first contends Claim Three fails to raise a federally cognizable claim. Doc. No. 17-1 at 36–37. Specifically, Respondent asserts: "Andrade's challenge to this evidentiary ruling merely concerns a question of the applicability of California evidentiary rules, i.e. California's Evidence Code § 352," and "Andrade cannot convert this state-law claim into a federal one simply be labeling it a violation 'of his federal constitutional rights to due process and a fair trial.'" *Id.* at 37 (quoting *Poland v. Stewart*,

169 F.3d 573, 584 (9th Cir. 1999)).  Again, the Court concurs a claim of error in the application of state law is generally not cognizable on federal habeas review.  *See McGuire*, 502 U.S. at 67–68.  However, here it is again evident Petitioner is not merely raising a claim of state law error nor just attempting to "convert" a state law issue into a federal one by citing a federal constitutional guarantee.  Instead, Petitioner substantively asserts "given the prejudicial nature of the evidence, and the closeness of the case, it is reasonably probable [petitioner] would have received a more favorable outcome, had the error not occurred," *see* Doc. No. 1 at 93, 97–98, and as discussed previously, the erroneous admission of evidence may state a federal claim if the admission of such evidence rendered Petitioner's trial fundamentally unfair.  *See Ortiz-Sandoval*, 81 F.3d at 897 ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'" (quoting *Kealohapauole*, 800 F.2d at 1465)); *see also Jammal*, 926 F.2d at 919–20 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.").  Claim Three is thus cognizable on federal habeas corpus.

Even so, Petitioner fails to demonstrate the admission into evidence of the knife found at his home rendered his trial fundamentally unfair in violation of the federal constitution, in view of the fact the knife found at Petitioner's home was not ruled out as the murder weapon coupled with the lack of conclusive identification of any of the recovered knives as the murder weapon.  Both the prosecution and defense presented testimony from expert witnesses who disagreed on whether the knife recovered from Figueroa's home matched the stab wounds on the victim as well as had divergent opinions even as to the type of knife that made the wounds in question.

Darryl Garber, M.D., the prosecution's forensic expert who conducted the victim's autopsy, opined the knife recovered from Figueroa's home was "certainly" long enough to have caused the victim's stab wounds, and given it had one blunt and one sharp side and was smooth, "would be a very likely candidate for the weapon that caused" at least

one of the wounds.  Reporter's Tr. at 2456, 2459, 2461.  Yet, Dr. Garber could not say to a reasonable degree of medical certainty the knife recovered from Figueroa's home was the murder weapon, nor could he say all three of the victim's stab wounds were "necessarily" caused by the same knife, only ones with similar characteristics.  *Id.* at 2476.  Dr. Garber did not recall doing so but acknowledged it was possible he told an investigator at the autopsy a different knife recovered at a newsstand could have caused the wounds, while at trial he stated that knife "was not likely the weapon used" because some of its characteristics were inconsistent with the wounds.  *Id.* at 2478–80, 2482–83.

Meanwhile, Harry Bonnell, M.D., a defense retained forensic pathologist who reviewed the photos of the case and the autopsy report, opined he was unable to "tell for sure" if the weapon used had a serrated or straight edged blade, stating the "blade is no longer than four inches," but there were "no characteristics that separate it from being serrated or not being serrated."  *Id.* at 3089.  Dr. Bonnell found it "possible" the knife recovered from the newsstand caused the wounds.  Reporter's Tr. at 3089.  With respect to the knife recovered at Figueroa's residence, Dr. Bonnell did not believe it was long enough to have caused the fatal wound, stating he "would expect there would be tearing of the skin" had it gone in that far given that knife had a "nodule" on it.  *Id.* at 3100, 3118–19.  Dr. Bonnell opined the wounds inflicted on the victim were "consistent with a smooth, single-edge knife" but were also consistent with a serrated blade.  *Id.* at 3115–16.  Dr. Bonnell stated if Dr. Garber said the knife found at Figueroa's residence could have made the wounds, Bonnell disagreed, and "[a]ssuming the autopsy report is accurate, that blade did not cause the chest wound."  *Id.* at 3119, 3121.

Again, the experts disagreed as to whether the knife found at Figueroa's home could have caused the victim's wounds, but not even the prosecution expert, who thought it "a very likely candidate," could say with confidence that particular knife was the murder weapon.  More importantly, however, neither expert rendered an opinion as to whether the knife recovered from Petitioner's residence could be excluded as a potential murder weapon, nor does Petitioner point to any evidence introduced at trial which

eliminated the possibility the knife recovered from Petitioner's home was used in the stabbing.

Given the conflicting expert testimony, the lack of definitive identification of the knife used in the stabbing and the failure of either the prosecution or defense expert to exclude the possibility the knife recovered from Petitioner's home was the knife that inflicted the fatal wound on the victim, it is clear from a review of the record there were "permissible inferences" the jury could draw from the knife recovered from Petitioner's home. *See Jammal*, 926 F.2d at 919–20.

Nor does Petitioner demonstrate prejudice, as the evidence presented against Petitioner at trial was quite strong. Numerous eyewitnesses who accompanied the victim to the party identified Petitioner both in court and from earlier photographic lineups as the person who confronted and stabbed the victim. Petitioner's cousin, who was already at the party, similarly identified Petitioner to police as having stabbed the victim. Finally, another witness also already at the party not only saw the stabbing and identified Petitioner to police, but also told police Petitioner and a group of Petitioner's friends had thereafter come to his home and given him a knife to get rid of or hide.

Yulinda Garza,[2] the victim's sister, was behind her brother approaching the address where the party was when an individual, who she identified as Petitioner, confronted her brother and asked about his gang affiliation. Reporter's Tr. at 1621–23. Yulinda left for her car after the confrontation because she felt unsafe and her brother remained; she stated Petitioner was standing in front of her brother when she left. *Id.* at 1634–35, 1657. Yulinda gave the police a description of the individual who confronted her brother and was positive it was Petitioner; she told police she did not see who stabbed him because she had left towards her car prior to the fight breaking out. *Id.* at 1669–70. Aaron Garcia, another member of Garza's group, also identified Petitioner as

---

[2] Following the procedure employed by the state court, this Court similarly refers to Yulinda Garza by her first name, as she shares the surname of victim Martin Garza, and refers to the victim by his surname.

the individual who was being aggressive towards and confronting the victim just before the stabbing. *Id.* at 2176–77, 2184–85. Joe Delgado, another individual in Garza's group, also identified Petitioner as the person who approached them "[v]iolent" and "[l]ike banging" when they arrived at the party. *Id.* at 2125–26. Delgado saw Garza fall, saw the wounds, and tried to put pressure on them, and while he did not see who stabbed Garza, he was positive Petitioner was the person who approached them "banging." *Id.* at 2139–45.

Two other individuals who accompanied Garza to the party identified Petitioner as the individual who stabbed Garza. Lloyd Johnson, a friend of Garza's, saw the stabbing and identified Petitioner in court as the individual who stabbed Garza with a knife. Reporter's Tr. at 2224–26, 2230. Johnson had previously identified Petitioner from a photo lineup several days after the crime but had failed to identify anyone from an earlier photo lineup. *Id.* at 2236–39. Daniel Camargo, another member of Garza's group, also witnessed the stabbing and identified Petitioner in court as the perpetrator. *Id.* at 2329–31. Camargo previously identified Petitioner's photo from a lineup just after the incident. *Id.* at 2337–39.

Brandon Quevedo, who attended the party and knew both Garza and Petitioner, greeted Garza when his group arrived at the party and stated Petitioner came out and started asking Garza gang stuff. *Id.* at 1927, 1937, 1943–44. Quevedo stated they were friends and said Petitioner seemed okay at that point, but then shortly after started fighting and pulled out a shank. *Id.* at 1947–51. Quevedo saw the first blow to Garza's stomach and: "I just looked away and I started trying to push him away." *Id.* at 1952–53. Quevedo said when Garza fell, Petitioner kept on fighting and he saw Petitioner stab Garza again, stating: "I seen a couple of stab wounds before I started to run away," and said he was so close to the incident: "I got bloodstains on my pants, and bloodstains on my shoes." *Id.* at 1954–60. Quevedo spoke to police and identified Petitioner as the perpetrator from photos, and additionally identified Petitioner in court. *Id.* at 1959–60.

1    Petitioner's cousin Manuel Barrios testified at trial he did not recall telling police
2    he was standing near Petitioner when Petitioner stabbed a guy nor telling police he saw
3    the knife. *Id.* at 1809, 1813, 1817–18. The prosecution introduced transcripts of and
4    played videotapes from Barrios' interviews with police in the days following the murder.
5    *Id.* at 1887, 1889, 1896. In those interviews, Barrios told police Petitioner was the
6    individual who stabbed Garza and added: "I know he stabbed him, but I don't know
7    where he stabbed him." Doc. No. 18-9 ("Clerk's Supp. Tr.") at 52, 55. Barrios also
8    identified Petitioner by name and photo as the perpetrator from a set of photos shown to
9    him. *Id.* at 62–63. Daniel Figueroa similarly testified at trial he did not recall giving a
10   statement to police or probation, did not recall the party in question and was not at the
11   party, did not recall a photo lineup nor did he recall telling police about a knife given to
12   him and found in his residence. Reporter's Tr. at 2274–87, 2294–99, 2309–12. The
13   prosecution introduced into evidence the transcript and video of the Figueroa interviews.
14   *Id.* at 2492, 2497. Figueroa told police he was "right there" when the stabbing happened
15   and afterwards: "I went home and they followed me to my house and they wanted me to
16   get rid of the knife," and he had them put it in a box. Clerk's Supp. Tr. at 93–94.
17   Figueroa stated he saw Garza stabbed in "the chest, something like that" and afterwards
18   Petitioner, who he identified by name and who Figueroa said had the knife, came to his
19   residence with others asking Figueroa to hide the knife. *Id.* at 95–96. The police showed
20   Figueroa some photos and he identified Petitioner's photo, called Petitioner by his first
21   name, and said he was "[p]ositive" that was the individual who stabbed Garza. *Id.* at 98–
22   99.

23        Given the strength of the evidence against Petitioner, Petitioner fails to show
24   fundamental unfairness, or that any potential error arising from the allegedly erroneous
25   admission of the knife into evidence had a "substantial and injurious effect or influence in
26   determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Fry*, 551 U.S. at 119
27   (Section 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an
28   entitlement to it."). And because Petitioner fails to demonstrate the state court decision

was either contrary to or an unreasonable application of clearly established federal law or that it was based on an unreasonable factual determination, habeas relief is not available. As such, Claim Three does not merit habeas relief.

## V. CERTIFICATE OF APPEALABILITY

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except where "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254. "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The Court declines to issue a certificate of appealability, as reasonable jurists would not find debatable or incorrect the Court's conclusion habeas relief is not warranted on any of the three claims presented in the federal Petition, nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. 2253(c); *Slack*, 529 U.S. at 484.

## VI. CONCLUSION

For the reasons discussed above, the Court **DENIES** the Petition for a writ of habeas corpus and **DENIES** a certificate of appealability.

**IT IS SO ORDERED**.

Dated: March 1, 2022

HON. MICHAEL M. ANELLO
United States District Judge